# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| SEARCHLIGHT CST, L.P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 2020-0652-SG |
| | ) |
| MEDIAMATH HOLDINGS, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Date Submitted: September 23, 2020
Date Decided: September 28, 2020

Eric D. Schwartz, Thomas W. Briggs, Jr., and Thomas P. Will, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Eric D. Winston, Kristen Bird, and Bennett Murphy, of QUINN EMANUEL URQUHART & SULLIVAN LLP, Los Angeles, California, *Attorneys for Plaintiff Searchlight CST, L.P.*

Richard I.G. Jones, Jr., Michael W. McDermott, David B. Anthony, and Peter C. McGivney, of BERGER HARRIS LLP, Wilmington, Delaware; OF COUNSEL: David H. Wollmuth, R. Scott Thompson, Brad J. Axelrod, Joshua M. Slocum, and John R. Hein, of WOLLMUTH MAHER & DEUTSCH LLP, New Yok, New York, *Attorneys for Defendant MediaMath Holdings, Inc.*

GLASSCOCK, Vice Chancellor

This matter is before me on the Plaintiff's request for a Temporary Restraining Order and the Defendant's Motion for Summary Judgement, which were argued together on an expedited basis. My consideration requires a straightforward exercise in contract interpretation. The Plaintiff is an investor in the Defendant. In connection with its purchase of preferred stock, it contracted (via an investor rights agreement) for certain limitations on the Defendant's freedom of action, including a limit on the amount of indebtedness that the Defendant is able to incur. That is the contractual provision at issue here. The Defendant is in the process of negotiating a new credit facility, and the Plaintiff contends that the Defendant is contractually prohibited from entering the facility (or borrowing thereunder) without its consent. The Defendant construes the contractual provision to provide a debt limit such that it is permitted to enter the new debt facility, without obtaining the Plaintiff's consent. It faces a potential default under the existing credit facility; thus the expedited nature of this litigation. The parties are in agreement that the contractual language at issue is unambiguous, but they fundamentally disagree about its meaning.

Upon review, I find that the contract does not require the Defendant to obtain the Plaintiff's consent before entering or borrowing under the proposed credit facility, up to $100 million. Accordingly, I grant the Defendant's Motion for Summary Judgment, and the TRO request is moot. My reasoning follows.

1

# I. BACKGROUND[1]

*A. The Parties*

Defendant MediaMath Holdings, Inc. ("MediaMath") is a Delaware corporation.[2]   MediaMath is in the digital advertising industry, and provides advertisers, advertising agencies, and brands with technology and support to plan, optimize, and analyze marketing programs across digital media.[3]

Plaintiff Searchlight CST, L.P. ("Searchlight") is a Delaware limited partnership and a preferred shareholder of MediaMath.[4]   Searchlight invested in MediaMath in June of 2018.[5]

*B. MediaMath's Credit Agreement*

In May 2017, more than a year before Searchlight's investment, MediaMath executed a Credit and Guaranty Agreement (the "Credit Agreement") with lenders including Goldman Sachs Bank USA, and Santandar Bank, N.A. (the "Lenders").[6] The Credit Agreement provides for a secured revolving credit facility, pursuant to

---

[1] I base the facts for this summary judgment ruling on the evidence submitted under affidavit with the parties' papers as well as the parties' pleadings where undisputed facts are involved.

[2] Transmittal Aff. of Richard I. G. Jones, Jr., Esq. in Opp'n to TRO and in Supp. of Summ. J. ("Jones Aff."), Ex. 1, Amended and Restated Certificate of Incorporation of MediaMath Holdings, Inc. ("MediaMath Charter"), at 1, Dkt. No. 23.

[3] Unsworn Declaration of Daniel Bisgeier ("Bisgeier Decl.") ¶ 2, Dkt. No. 23.

[4] Jones Aff., Ex. 2, Searchlight Capital Partners, L.P. Form ADV Part 2A ("Searchlight Form ADV"), at Item 4.A, Dkt. No. 23.

[5] Verified Compl. For Injunctive Relief ("Compl.") ¶ 16, Dkt. No. 1; Def.'s Answer to Pl.'s Verified Compl. And Def.'s Verified Countercl. with Certificate of Service ("Answer") ¶ 16, Dkt. No. 62.

[6] Compl., Ex. B, Credit and Guaranty Agreement ("Credit Agreement").

which the Lenders committed to fund up to $175 million from which MediaMath could borrow.[7]

The Credit Agreement limits MediaMath's ability to incur "Indebtedness" subject to certain exceptions.[8] The term "Indebtedness" is a category encompassing eight different types of obligations, one of which is "all indebtedness for borrowed money."[9] The remaining seven types of obligations do not necessarily involve borrowed money. For example, Indebtedness also includes "notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money"[10] and "any obligation owed for all or any part of the deferred purchase price of property or services."[11] One type of permitted Indebtedness is that MediaMath may incur the "Obligations."[12] The "Obligations" are, in essence, the principal, interest, and other obligations of MediaMath incurred under the Credit Agreement.[13]

The aggregate amount of the "Revolving Commitments" of the Lenders is $175 million.[14] This means that that the Lenders must be *prepared* to lend MediaMath loans in that aggregate amount. But the amount MediaMath may borrow

---

[7] *Id.*
[8] *Id.*, § 6.1.
[9] *Id.*, § 1.1, "Indebtedness."
[10] *Id.*, § 1.1(iii).
[11] *Id.*, § 1.1(iv).
[12] *Id.*, § 6.1(a).
[13] *Id.*, § 1.1, "Obligations."
[14] *Id.*, § 1.1, "Revolving Commitment."

3

is also limited by another factor. Specifically, the aggregate principal amount of all outstanding loans under the Credit Agreement[15] cannot exceed the lesser of (i) $175 million and (ii) the "Borrowing Base."[16] The Borrowing Base's primary input is "Eligible Accounts,"[17] which includes MediaMath's accounts receivable with certain exclusions.[18] Therefore, the aggregate amount MediaMath may borrow under the Credit Agreement—and, consequently, the maximum Obligations MediaMath can be responsible to repay[19]—is limited by way of a test on MediaMath's accounts receivable through the Borrowing Base.

*C. Searchlight's Investment in MediaMath*

On June 29, 2018, Searchlight invested $119.7 million in MediaMath in return for 126,000 shares of Series D Preferred Stock (the "Series D Preferred Stock"), pursuant to a Series D Preferred Stock purchase agreement.[20] The key economic elements of Searchlight's Series D Preferred Stock investment included (a) a flat

---

[15] Plus "Letter of Credit Usage," which is not pertinent here.

[16] Credit Agreement, § 2.2.

[17] *Id.*, § 1.1 "Borrowing Base" ("'**Borrowing Base**' means, as of any date of calculation, a dollar amount equal to (i) the sum of: (x) 85% of Eligible Accounts calculated pursuant to the Borrowing Base Certificate most recently delivered to the Agents in accordance with the terms hereof plus (y) if a Permitted Overadvance Period is then in effect in accordance with the terms of this Agreement, the Permitted Overadvance, minus (ii) (without duplication of any criteria or limitations addressed by the definition of Eligible Accounts) Reserves then established by the Administrative Agent in its Permitted Discretion in accordance with Section 2.2(d).").

[18] *Id.*, § 1.1 "Eligible Accounts," "Accounts." The accounts receivable that are excluded from Eligible Accounts (and thus from Borrowing Base) are determined according to the definition of "Eligible Accounts," which is complex and need not be fully recited for the purposes of this Opinion.

[19] And which are permitted Indebtedness.

[20] Compl. ¶ 16; Answer ¶ 16.

4

15% annual interest rate, paid-in-kind and compounded quarterly and (b) 3.0% detachable warrants, of which 50% were struck at a cost basis of $1.3 billion equity value and 50% with a *de minimis* cost basis.[21] Searchlight's investment is the most senior equity security in MediaMath's debt waterfall.[22]

When Searchlight invested in MediaMath, the parties entered into an Amended and Restated Investor Rights Agreement (the "IRA").[23] For purposes of this Memorandum Opinion, the only relevant parts of the IRA are Section 3.10(a)(iii) and Section 3.10(b).[24] Section 3.10(a)(iii) provides, that:

> (a) At any time when shares of Series D Stock are outstanding, in addition to any other vote or consent required by the Certificate or by law, the Company shall not, nor permit any subsidiary of the Company to, effect or validate any of the following actions (whether by amendment, merger, consolidation, or otherwise), without the written approval of Searchlight (the "***Series D Approval***"):
>
> (iii) incur indebtedness that (A) is in excess of the greater of (x) three times (3x) the Company's Consolidated Adjusted EBITDA (as defined in the agreements governing the Credit Facility[25] (as defined below), the "***Consolidated Adjusted EBITDA***") for the preceding twelve (12) months as shown on the latest financial statements delivered to the Administrative Agent under the Company's credit facility which is in place as of the date of this Agreement (the "***Credit Facility***") and (y)

---

[21] Compl. ¶ 21; Answer ¶ 21.

[22] Compl. ¶ 30; Answer ¶ 30.

[23] Compl., Ex A, Amended and Restated Investor Rights Agreement ("IRA").

[24] The parties, at oral argument, each took positions regarding Sections 2.2(c) and 2.13(e), by way of assisting in the interpretation of Section 3.10(a)(iii). I do not find that either section is particularly helpful in parsing the language of Section 3.10(a)(iii); although Section 3.10(a)(iii) is lengthy, I find that it speaks for itself, as an unambiguous provision tends to do.

[25] The IRA refers to the credit facility provided for in the Credit Agreement as the "Credit Facility." For purposes of this Opinion, I will refer to the agreement itself as the Credit Agreement, which lays out a scheme for a secured revolving credit facility with a $175 million loan commitment.

the maximum amount of indebtedness permitted under the terms of the Credit Facility or any successor or replacement facility having financial terms regarding maximum indebtedness no less restrictive than those applicable to the Credit Facility, assuming the Credit Facility could be fully drawn but not giving effect to any repayments and borrowings thereunder, or (B) would cause the Company's total indebtedness for borrowed money (excluding, for the avoidance of doubt, obligations with respect to the Series D Stock and Indebtedness (as defined in the agreements governing the Credit Facility) permitted to be incurred by the Company or its subsidiaries in accordance with the terms of the Credit Facility), after giving effect to such incurrence, to exceed $175,000,000; <u>provided</u> that on and after January 1, 2019, if the Consolidated Adjusted EBITDA for the preceding twelve (12) months as shown on the latest financial statements delivered to the Administrative Agent under the Credit [Agreement] or any subsequent period of twelve (12) months as shown on the latest financial statements delivered to the Administrative Agent under the Credit [Agreement] is at least $43,000,000, then such maximum permitted indebtedness amount shall increase from $175,000,000 to $225,000,000[.][26]

Section 3.10(b) provides the remedy for violations of Section 3.10(a)(iii):

Any resolution authorizing, any agreement or arrangement entered into which obligates the Company to take any action and any action taken by the Company, the Board or any Person acting on behalf of or at the direction of the foregoing in contravention of the provisions of this Section 3.10 shall be deemed to be unauthorized and shall be void ab initio.[27]

In addition to entering the IRA, the parties (and the Lenders) also amended the Credit Agreement in connection with Searchlight's investment (the "Amendment").[28] The Amendment added a concept called a "Covenant Trigger

---

[26] IRA, § 3.10(a)(iii).
[27] *Id.*, § 3.10(b).
[28] Compl., Ex. B, Amendment No. 1 to Credit and Guaranty Agreement ("the Amendment").

Event," which occurs when the monthly average (as of the last day of each month) of MediaMath's cash is less than $45,000,000.[29] On the last day of the fiscal quarter in which a Covenant Trigger Event occurs, and continuing until MediaMath's monthly average cash is equal to or greater than $45,000,000 (once again, as of the last day of the month), MediaMath enters a "Covenant Testing Period."[30] During the Covenant Testing Period, MediaMath is subject to certain financial covenants.[31] For example, during a Covenant Testing Period, MediaMath must maintain a minimum "Consolidated Adjusted EBITDA."[32] The minimum Consolidated Adjusted EBITDA for the twelve-month period ending on September 30, 2020 is $30 million.[33] MediaMath's failure to comply with any negative covenant—including the financial covenants that arise while in a Covenant Testing Period—constitutes an "Event of Default" under the Credit Agreement.[34] The Amendment did not make any changes to the definition of "Indebtedness."[35] The Credit Agreement—as amended by the Amendment—is still in effect.[36]

---

[29] The Amendment, at 2. The test is actually of "Qualified Cash" which means cash and cash equivalents held by MediaMath and its subsidiaries (plus certain additions). Credit Agreement, § 1.1, "Qualified Cash." For purposes of this Opinion, it is sufficient to consider the Covenant Trigger Event to occur when MediaMath has insufficient cash.

[30] The Amendment, at 2.

[31] The Amendment, at 5–6.

[32] The Amendment, at 5–6.

[33] The Amendment, at 6.

[34] Credit Agreement, § 8.3.

[35] *See generally* the Amendment.

[36] *See generally* Compl.

*D. MediaMath's Performance Risks Default*

MediaMath has posted net losses from operations every year since Searchlight's investment. It ended 2018 with a $24.6 million net loss from operations and 2019 with a $47.9 million net loss from operations.[37] Its financial performance declined in early 2020 and has continued to decline after the onset of the COVID-19 pandemic.[38] MediaMath recognized in late 2019 and early 2020 that it was at risk of breaching some of the Credit Agreement covenants sometime during 2020.[39] At the time of the filing of the Complaint, MediaMath projected that it would have only $34.4 million of cash as of September 30, 2020 and $43.3 million by the end of 2020.[40] At that time, MediaMath also projected that, for the fiscal year ending in 2020, it will have a negative EBITDA of $7.2 million.[41]

In April 2020, MediaMath hired restructuring and legal advisors, and, in May 2020, MediaMath retained Centerview Partners ("Centerview") to advise it on financial matters and explore a range of potential capital solutions with existing and prospective investors.[42] Centerview engaged with potential investors and lenders in order to explore possible financing options while Searchlight advocated a sale

---

[37] Compl. ¶¶ 48–49; Answer ¶¶ 48–49.
[38] Compl. ¶¶ 52–53; Answer ¶¶ 52–53.
[39] Bisgeier Decl. ¶ 5.
[40] Compl. ¶ 81; Answer ¶ 81.
[41] Compl. ¶ 70; Answer ¶ 70. Since the filing of the Complaint, MediaMath's financial situation appears to have stabilized. Decl. of Heather Gray ¶ 8, Dkt. No. 39.
[42] Bisgeier Decl. ¶7.

transaction.[43]   On August 17, 2020, MediaMath's Chief Investment Officer acknowledged that MediaMath was at "increasingly high risk of breaching the Credit [Agreement's] covenants in 2020."[44]

*E. MediaMath Attempts to Replace the Credit Agreement*

On July 15, 2020, in an effort to avoid impending default under the Credit Agreement, MediaMath executed a term sheet ("MidCap Term Sheet" or "Term Sheet") with a prospective lender, MidCap Financial Services, LLC ("MidCap").[45] The loan facility under the MidCap Term Sheet would replace the one provided for by the Credit Agreement.[46]

The MidCap Term Sheet provides for a maximum financing commitment of $100 million (versus $175 million under the Credit Agreement).[47]   Although the maximum commitment under the MidCap Term Sheet is *lower* than that of the Credit Agreement, the Term Sheet in fact contains some provisions more favorable to MediaMath.  For instance, the limitations on the permitted borrowing amount are more lenient under the Term Sheet than under the Credit Agreement.[48]   Another is

---

[43] Bisgeier Decl. ¶ 8–9.
[44] Bisgeier Decl. ¶ 8.
[45] Bisgeier Decl. ¶ 10.
[46] Bisgeier Decl. ¶ 10.
[47] Bisgeier Decl. ¶ 10.
[48] Specifically, the Credit Agreement's definition of the "Borrowing Base" is more restrictive than the Term Sheet's definition and excludes certain accounts receivable that the Term Sheet includes. Pl.'s Br. in Supp. of its Mot. for a TRO ("TRO Opening Brief") 24–25, Dkt. No. 4; Def.'s Answering Br. in Opp'n to Pl.'s Mot. for a TRO and Opening Br. in Supp. of Def.'s Mot. for

that the concept of a "Covenant Testing Period," and other financial maintenance covenants, are eliminated and replaced with less restrictive financial covenants. [49]

The Term Sheet's more lenient limitations would significantly lower MediaMath's risk of default as compared to the Credit Agreement.[50] According to Searchlight, the Credit Agreement, at the time the Term Sheet was executed, would only allow MediaMath to borrow up to $64.3 million, of which MediaMath had already borrowed $63.3 million (both as of June 30, 2020).[51] The Term Sheet's more lenient limitations would allow MediaMath to borrow at least $5–10 million more.[52]

Searchlight notified MediaMath on July 21, 2020 that its consent was required for the MidCap Term Sheet under Section 3.10(a)(iii) of the IRA and that Searchlight refused to give its consent.[53] On July 23, 2020, MediaMath's counsel responded by rejecting Searchlight's contention that Searchlight's consent was required under the section cited.[54]

Summ. J. ("Summ. J. Opening Brief") 12, Dkt. No. 23; *compare* Credit Agreement § 1.1 , "Eligible Accounts" *with* Compl., Ex. C, MidCap Term Sheet, at 2.
[49] TRO Opening Br. 25; *see generally* MidCap Term Sheet.
[50] Bisgeier Decl. ¶ 10.
[51] TRO Opening Br. 23–24.
[52] *Id.*
[53] Compl. ¶ 73; Answer ¶ 73.
[54] TRO Opening Br. 26–27.

*F. Procedural History*

Searchlight filed its Verified Complaint for Injunctive Relief (the "Complaint") on August 5, 2020. Searchlight seeks a declaratory judgment that MediaMath "was obligated to seek Searchlight's consent, and cannot proceed with, the [MidCap Term Sheet] transaction" and that "pursuant to Section 3.10(b) of the IRA, authorizing or consummating the [MidCap Term Sheet] transaction is unauthorized and void *ab initio*."[55] Searchlight also asserts a claim for breach of contract (the IRA) and seeks attorney's fees under a "loser pays" provision in the IRA.[56]

Concurrently with the Complaint, Searchlight filed a Motion for TRO. Searchlight seeks an order that: "Defendant MediaMath Holdings, Inc. and its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with it, are hereby ENJOINED from consummating the [MidCap Term Sheet] transaction."[57] MediaMath filed its opposition to the Motion for TRO on August 17, 2020 concurrently with a Motion for Summary Judgment. I expedited the matter and heard Oral Argument on Searchlight's TRO Motion and MediaMath's Summary Judgment Motion on September 23, 2020 and now consider the matter fully submitted.

---

[55] Compl. ¶¶ 85–89.
[56] Compl., ¶¶ 91–104.
[57] [Proposed] Order Granting Pl. Searchlight CST, L.P.'s Mot. for a TRO ¶ 2, Dkt. 4.

## II. ANALYSIS

Put simply, this case is about the interaction between two contracts and one would-be contract, which is the target of Searchlight's TRO. These documents are: (1) the IRA, (2) the Credit Agreement, and (3) the MidCap Term Sheet. The central issue is whether MediaMath can replace document (2) with document (3) without obtaining Searchlight's consent under document (1).

When contractual language is the source of the dispute, the Court "give[s] priority to the intention of the parties . . . by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language. In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning."[58] The parties do not contest the meaning or language of either the Credit Agreement or the MidCap Term Sheet; rather, they disagree as to how the IRA—specifically Section 3.10(a)(iii) of that agreement—applies to these documents.

*A. The Relevant Text of the IRA and the Parties' Arguments*

As noted above, Section 3.10(a)(iii) of the IRA reads:

(a) At any time when shares of Series D Stock are outstanding, in addition to any other vote or consent required by the Certificate or by law, the Company shall not, nor permit any subsidiary of the Company to, effect or validate any of the following actions (whether by amendment, merger, consolidation, or otherwise), without the written approval of Searchlight (the "***Series D Approval***"):

---

[58] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).

12

(iii) incur indebtedness that (A) is in excess of the greater of (x) three times (3x) the Company's Consolidated Adjusted EBITDA (as defined in the agreements governing the Credit Facility (as defined below), the "***Consolidated Adjusted EBITDA***") for the preceding twelve (12) months as shown on the latest financial statements delivered to the Administrative Agent under the Company's credit facility which is in place as of the date of this Agreement (the "***Credit Facility***") and (y) the maximum amount of indebtedness permitted under the terms of the Credit Facility or any successor or replacement facility having financial terms regarding maximum indebtedness no less restrictive than those applicable to the Credit Facility, assuming the Credit Facility could be fully drawn but not giving effect to any repayments and borrowings thereunder, or (B) would cause the Company's total indebtedness for borrowed money (excluding, for the avoidance of doubt, obligations with respect to the Series D Stock and Indebtedness (as defined in the agreements governing the Credit Facility) permitted to be incurred by the Company or its subsidiaries in accordance with the terms of the Credit Facility), after giving effect to such incurrence, to exceed $175,000,000; <u>provided</u> that on and after January 1, 2019, if the Consolidated Adjusted EBITDA for the preceding twelve (12) months as shown on the latest financial statements delivered to the Administrative Agent under the Credit [Agreement] or any subsequent period of twelve (12) months as shown on the latest financial statements delivered to the Administrative Agent under the Credit [Agreement] is at least $43,000,000, then such maximum permitted indebtedness amount shall increase from $175,000,000 to $225,000,000[.][59]

Although its length appears daunting and its organization is needlessly complex, Section 3.10(a)(iii) can easily be broken down into three subsections: (A)(x), (A)(y), and (B). Each of these three subsections provides a cap on the amount of indebtedness MediaMath may incur—although only one of (A)(x) and (A)(y) will actually be prohibitory because Section 3.10(a)(iii)'s prohibition is

---

[59] IRA, § 3.10(a)(iii).

against borrowing more than the *larger* of the amounts provided for in the two subsections. Despite the existence of arguably three potential caps, the parties both concede that the caps provided for in Subsections (A)(x) and (B) do not apply to the situation at hand. Nevertheless, given the apparent complexity of Section 3.10(a)(iii), I will endeavor to address all parts of it.

Because I find the language unambiguous, I address MediaMath's Summary Judgment Motion;[60] because that motion resolves the first prong of any TRO inquiry—likelihood of success on the merits—against Searchlight, the TRO request becomes moot.

I first note the while Searchlight construes the relevant contractual language as a restriction on MediaMath entering a new credit facility, on its face the contractual language only limits MediaMath's maximum indebtedness, and *not* the source of the indebtedness. The contractual language, as explained below, provides a series of yardsticks by which that maximum indebtedness must be measured. This makes sense in light of Searchlight's interests in entering the IRA, which included protecting its investment by curtailing MediaMath's ability to incur debt without Searchlight's consent. With this in mind, I turn to the issue of whether MediaMath's

---

[60] Contractual disputes lend themselves to motions for summary judgement, as the meaning of an unambiguous contract is an issue of law. *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007) ("Where the dispute centers on the proper interpretation of an unambiguous contract, summary judgment is appropriate because such interpretation is a question of law.").

exercise of its full borrowing ability under the MidCap Term Sheet would violate Subsection (A)(y) of Section 3.10(a)(iii). To address the parties' arguments on (A)(y), it is instructive to first parse the three subsections of which Section 3.10(a)(iii) is composed.

The first subsection in Section 3.10(a)(iii) is Subsection (A)(x), which prohibits MediaMath from "incur[ring] indebtedness that . . . is in excess of . . . three times the Company's Consolidated Adjusted EBITDA . . . for the preceding twelve months . . . ."[61]—a one-year rolling average EBITDA test. This subsection is, of course, not applicable to MediaMath's current situation[62] because MediaMath's forecasted Adjusted EBITDA for the 2020 fiscal year is negative and will therefore be less than (A)(y)—and MediaMath is only capped by the *greater* of (A)(x) and (A)(y).

Subsection (B) prohibits MediaMath from "incur[ring] indebtedness that . . . would cause its total indebtedness for borrowed money . . . , after giving effect to such incurrence, to exceed $175,000,000 . . ." and, in certain circumstances, up to $225,000,000.[63] In other words, even if the limits in Subsection A would permit borrowing in excess of these hard limits—for instance, if the 3x EBITDA provision allowed it—Subsection B places hard limits on indebtedness. This subsection is also

---

[61] IRA, § 3.10(a)(iii).
[62] The parties do not contest that Subsection (A)(x) does not apply. TRO Opening Br. 33.
[63] IRA, § 3.10(a)(iii).

not applicable—and the parties do not argue that it is[64]—because it caps MediaMath's total amount of borrowed money at $175 million, which is well in excess of the $100 loan commitment provided for in the MidCap Term Sheet.

This leaves Subsection (A)(y), which is the only subsection the parties dispute the meaning of. That subsection prohibits MediaMath from "incur[ring] indebtedness that . . . exceeds . . . the maximum amount of indebtedness permitted under the terms of the Credit Facility or any successor or replacement facility having financial terms regarding maximum indebtedness no less restrictive than those applicable to the Credit Facility, assuming the Credit Facility could be fully drawn but not giving effect to any repayments and borrowings thereunder."[65]

The parties offer two competing interpretations of Subsection (A)(y). Searchlight argues that the "maximum amount of indebtedness permitted" means the amount that MediaMath could *effectively* borrow at the time it executed the MidCap Term Sheet, given the applicable limitations imposed by the "Borrowing Base" at that time—$64.3 million. Again, the Credit Agreement has a borrowing limit of $175 million, but the Lenders are permitted to restrict borrowing to a lower amount—the "Borrowing Base"—which itself is derived from certain accounts receivable.[66] This construction would mean that (A)(y) provides a variable ceiling—

---

[64] Summ. J. Opening Br. 18.
[65] IRA § 3.10(a)(iii).
[66] Credit Agreement, § 1.1 "Borrowing Base"; *see* n.17 *supra*.

16

a ceiling that MediaMath was within $1 million of at the time it signed the MidCap Term Sheet—rather than a ceiling fixed at the loan commitment of the Credit Agreement ($175 million).[67] According to Searchlight, because Section 3.10(a)(iii)(A)(y) provides a variable ceiling of whatever was permitted to be borrowed *at the time of the execution of the Term Sheet* ($1 million more), and because the MidCap Term Sheet allows MediaMath to borrow more than the $1 million that the Credit Agreement allowed MediaMath to borrow as of that time, Searchlight has a consent right regarding the Term Sheet.[68]

MediaMath disagrees with this interpretation. MediaMath contends that the terms "maximum amount of indebtedness permitted under the Credit Facility" and "assuming the Credit Facility could be fully drawn" both indicate that (A)(y) refers to the loan commitment maximum of $175 million.[69]

---

[67] In support of this construction, Searchlight argues that: (1) the words "maximum" and "permitted" would not make sense unless (A)(y) refers to a variable ceiling; (2) the subsection cannot refer to the $175 million loan commitment because the parties would have simply referenced the loan commitment or the amount $175 million; and (3) the term "no less restrictive" would make no sense if Subsection (A)(y) referred to the loan commitment. TRO Opening Br. 18–33.

[68] In support of its TRO, Searchlight also makes much of the fact that the MidCap Term Sheet is less restrictive in terms of its lending conditions than the Credit Agreement, and that therefore entering a new credit facility with those terms would require its consent. But Section 3.10(a)(iii) only provides a yardstick for measuring the amount of indebtedness MediaMath is permitted to incur, and Subsection (A)(y) simply provides that the limitation of the (original) Credit Agreement is the yardstick unless a new facility at least as restrictive is entered, in which case the latter is the new yardstick. Section 3.10(a)(iii) does not restrict Media Math's ability to obtain credit outside the Credit Agreement, so long as its maximum indebtedness is not exceeded.

[69] MediaMath also notes that the term "such maximum permitted indebtedness amount" also appears in Subsection (B), and in that subsection clearly refers to $175 million. Using the maxim that "where the same word or phrase is used on more than one occasion in the same

To recapitulate, the parties disagree what maximum indebtedness yardstick is provided by Section 3.10(a)(iii)(A)(y) of the IRA. Searchlight proposes that the maximum is the amount available to MediaMath under the Credit Agreement at any given time, in light of the limitations implied by the Borrowing Base—that is, as of the execution of the MidCap Term Sheet, $63.4 million (of which only $1 million remained undrawn). MediaMath reckons the maximum allowed as $175 million, *i.e.*, the amount of the loan commitment under the Credit Agreement. As MediaMath clarified at oral argument, the subsection also contains a downward ratchet; if a new credit facility is entered with more restrictive terms as to the maximum indebtedness permitted thereunder, that becomes the new maximum under Subsection (A)(y) as well. Therefore, if MediaMath enters the proposed term sheet, under its construction the maximum indebtedness under Subsection (A)(y) will be the $100 million provided for in that new facility.

*B. Section 3.10(a)(iii)(A)(y) unambiguously refers to the loan commitment of $175 million.*

"A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, an ambiguity exists [w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or

---

instrument . . . there is a presumption that the same meaning was intended throughout such instrument," MediaMath argues that Subsection (A)(y)'s reference to the "maximum amount of indebtedness permitted" must also have meant $175 million. Summ. J. Opening Br. 19.

more different meanings."[70]  Here, I find that only one meaning gives effect to all terms in Subsection (A)(y) as written.

I emphasize that, notwithstanding the TRO request to enjoin entry of a debt facility, the contract language at issue simply defines the maximum amount of indebtedness MediaMath can incur absent consent from Searchlight.  What is that amount?  MediaMath's interpretation is straightforward.  It may borrow up to the "maximum amount" permitted by the Credit Agreement, $175 million, "assuming the Credit Facility could be fully drawn," that is, absent those limitations which may exist at any given time—involving the Borrowing Base—restricting a full draw. This comports with the plain language of the IRA.

Searchlight, for its part, asks me to interpret (A)(y) such that it sets maximum indebtedness at the amount MediaMath had the ability to borrow at any given time from the Lenders, given the limitations of the Credit Agreement.  Under this interpretation, "the maximum amount of indebtedness permitted under the terms of the Credit Facility"—that is, the amount of debt that MediaMath would in total be able to assume from any source—would vary from time to time; it would be based on the amount the Credit Agreement *at any given time* allowed MediaMath to borrow

---

[70] *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (quoting *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) and *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)) (internal quotation marks omitted).

from the Lenders, based on a formula applied to its accounts receivables, and absent the Lenders' agreement to exceed this formulaic limitation ($64.3 million, as of the time of entry of the term sheet). The result of this construction would be a sliding maximum indebtedness that would be commercially difficult to enforce. But the flaw in this interpretation is in the language itself.

First, Searchlight's construction requires me to insert language the parties themselves did not use in the IRA; the word "currently" is not included in (A)(y), nor is any other temporal word that would peg the calculation of the amount in (A)(y) to a particular time. Instead, Searchlight's construction requires the temporal term be inferred from the word "permitted," via a finding that that word means "entitled to be drawn *at the time of the incurrence of indebtedness*." But this cannot be the case, because the contract language explicitly provides otherwise—it measures maximum indebtedness "*assuming* the Credit Facility *could be fully drawn* but not giving effect to any repayments and borrowings thereunder."[71] This language excludes the limitations based on temporal considerations of the accounts receivable formula, and assumes that MediaMath is able to fully draw the credit limit that the Lenders committed to be prepared to lend. I find that Searchlight's interpretation cannot be squared with the language "assuming the Credit Facility could be fully drawn."

---

[71] IRA, § 3.10(a)(iii)(A)(y) (emphasis added).

20

In addition, Searchlight's construction also robs the term "maximum" in the phrase "the maximum amount of indebtedness permitted" under the Credit Agreement of any independent meaning—under Searchlight's reading, the maximum amount permitted is simply the actual amount Searchlight may draw. I should avoid a construction that renders contractual language meaningless or surplusage.[72]

I note that Searchlight itself makes a similar argument with respect to the same phrase, regarding the word "permitted"—it argues that unless "permitted" means "limited to the amount then currently available in light of the borrowing base," "permitted" is a redundancy. I simply do not read it that way. Permitted here is a way of saying that the amount is to be defined by or read under the Credit Agreement; to my mind, it is not surplusage.

Finally, MediaMath's interpretation alone gives full effect to the last part of (A)(y): the phrase "assuming the Credit Facility could be fully drawn but not giving effect to any repayments and borrowings thereunder." This phrase has two parts: the "fully drawn" part and the "not giving effect" part. The two parts are redundant under Searchlight's interpretation, where "maximum amount of indebtedness permitted" is pegged to the effective amount borrowable at a discrete point in time.

---

[72] *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) ("The contract must also be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term 'mere surplusage.'").

That is because Searchlight's interpretation incorporates the "Borrowing Base" limitation on borrowing directly into the phrase "maximum amount of indebtedness permitted" through the word "permitted." Then, once MediaMath's existing borrowings are "not given any effect," the "assuming the Credit facility could be fully drawn" part of the Subsection (A)(y) has no meaning, as all limitations on MediaMath's borrowing have already been accounted for by the other two phrases. For instance, at the time of the signing of the term sheet, the amount that MediaMath could borrow based on the credit base calculation was roughly $64 million. That would, per Searchlight, be *both* the amount available "assuming the Credit Facility could be fully drawn" *and also* the amount permitted, disregarding any repayments and borrowing. The two parts mean the same thing.

But when the phrase "the maximum amount of indebtedness permitted" means the commitment amount $175 million, this problem disappears. If "maximum amount of indebtedness permitted" means $175 million, the phrase still raises the question of whether that amount is subject to the Borrowing Base limitation, which would otherwise serve to limit the $175 million yardstick. The "fully drawn" assumption of Subsection (A)(y) serves to clarify that the Borrowing Base limitation does not apply; in essence, it instructs the parties that the yardstick is not limited by MediaMath's accounts receivable and can therefore be "fully drawn." And the "not giving effect" part serves a separate purpose—to clarify that

there is to be no deduction from the explicit limitations in the Credit Agreement; that is, MediaMath's existing borrowings under the Credit Agreement do not limit the "maximum amount of indebtedness permitted."

Under MediaMath's interpretation only, all three phrases—"maximum amount of indebtedness permitted," "assuming the Credit Facility could be fully drawn," and "not giving effect to any repayment and borrowings thereunder"—have independent meanings. Only MediaMath's interpretation comports with the language of the IRA without implying language not present in the text. Accordingly, I conclude that it is the only reasonable interpretation of Section 3.10(a)(iii)(A)(y) and grant MediaMath's Motion for Summary Judgment.

Because I have determined that Searchlight's construction is untenable, its TRO request—meant to vindicate that construction—is moot.

### III. CONCLUSION

MediaMath's Motion for Summary Judgment is GRANTED and Searchlight's Motion for Temporary Restraining Order is DENIED as moot. The parties should submit a form of order consistent with this Memorandum Opinion.

23